**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | **FOR PUBLICATION** |
| CELSIUS NETWORK LLC, *et al.,* | Case No. 22-10964 (MG) |
| Post-Effective Date Debtors. | Chapter 11 |
| MOHSIN Y. MEGHJI, as Representative for the Post-Effective Date Debtors, | |
| Plaintiff, | Adv. Pro. No. 24-04008 (MG) |
| v. | |
| INTO THE BLOCK CORP., | |
| Defendant. | |

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART THE DEFENDANT'S MOTION TO DISMISS**

*A P P E A R A N C E S :*

BRADFORD EDWARDS LLP
*Attorneys for Mohsin Y. Meghji, Litigation Administrator for Celsius Network LLC*
575 Fifth Avenue
14th Floor
New York, New York, 10017
By:    Denver G. Edwards, Esq.

MORRISON COHEN LLP
*Attorneys for Into the Block Corp.*
909 Third Avenue
New York, New York 10022
By:    Jason P. Gottlieb, Esq.
        Heath D. Rosenblat, Esq.
        Michael Mix, Esq.
        Dawn R. Sudama, Esq.

**MARTIN GLENN**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

Pending before the Court is the contested motion (the "Motion," ECF Doc. # 23) of

defendant Into the Block Corp. ("ITB" or "Defendant"), seeking dismissal, with prejudice, of all

counts asserted in the amended adversary complaint (the "Amended Complaint," ECF Doc. # 19)

filed by Mohsin Y. Meghji in his capacity as Litigation Administrator (the "Litigation

Administrator" or "Plaintiff") for Celsius Network LLC ("Celsius") pursuant to the *Modified*

*Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and its Debtor Affiliates*

*(Conformed for MiningCo Transaction)* (the "Plan," ECF Doc. # 4289).[1]  In support of the

Motion, the Defendant filed the declaration of Jesus Rodriguez, Chief Executive Officer of ITB

("Rodriguez" and his declaration, the "Rodriguez Decl.," ECF Doc. # 24).

On January 10, 2024, the Litigation Administrator filed a memorandum of law in

opposition to the Motion (the "Opposition," ECF Doc. # 28).  On January 28, 2025, ITB filed a

reply (the "Reply," ECF Doc. # 30).

For the reasons discussed below, the Court **GRANTS** the Motion with respect to Counts

I, III, IV, and V with prejudice and **DENIES** the Motion with respect to Count II.

## I.    BACKGROUND

### A.  Relevant Background

#### 1.  In General

Before Celsius's entry into chapter 11, Celsius and its affiliates served as one of the

largest cryptocurrency-based finance platforms worldwide, providing financial services to

institutional, corporate, and retail clients across more than 100 countries.  (Amended Complaint ¶

---

[1]     References to ECF docket numbers shall refer to those in the adversary proceeding unless otherwise
specified.  Additionally, defined terms used but not defined herein shall have the meanings ascribed to them in the
Plan.

6.)  By December 2020, Celsius had in excess of $3.3 billion in total assets under management, rendering it the second-largest digital asset manager internationally.  (Motion at 2.)

The Celsius business model centered on deploying digital assets transferred by users to generate income for Celsius and its operations and growth.  (Amended Complaint ¶ 8.)  Among other things, the Celsius platform enabled users to transfer digital assets and, in return, users could (i) earn weekly interest (also referred to as "rewards") on such assets and/or (ii) take out loans using the transferred assets as collateral.  (*Id.* ¶ 7; Motion at 2.)  Rewards earned varied based on the type and amount of crypto assets transferred to the Celsius platform.  (Amended Complaint ¶ 7.)  Celsius also made loans of fiat currency and "stablecoins"—cryptocurrency pegged to fiat currency, including the U.S. dollar—to third-party retail borrowers in the event such borrowers posted collateral in the form of cryptocurrency that exceeded the loan amount. (*Id.* ¶ 8.)

In late 2019 and early 2020, Celsius explored "additional revenue generating strategies," including "activities" in the realm of decentralized finance ("DeFi").  (*Id.*)  As a general matter, DeFi pertains to the provision of traditional financial services such as borrowing, lending, and market-making via the use of blockchain technology in a manner that eliminates the need for an institutional intermediary.  (*Id.* ¶ 9.)  Through use of "smart contracts" (*i.e.*, software programs that operate on a blockchain and self-execute when certain predetermined conditions are met), DeFi allows for peer-to-peer transactions without third-party involvement, including financial institutions and brokers.  (*See id.*)

Defendant ITB—a Delaware corporation with its principal place of business in Miami, Florida—is a self-described "intelligence company" that employs "machine learning and

statistical modeling to deliver actionable intelligence for crypto assets and smart financial

software solutions." (*Id.* ¶ 10; Motion at 4.)

2.   The Independent Contractor Agreement

To assist in its DeFi trading efforts, Celsius retained ITB as an independent contractor to

help develop certain DeFi trading strategies. (*Id.* at 2.) On October 22, 2020, Celsius and ITB

entered into the Independent Contractor Agreement (as amended, the "Agreement," Amended

Complaint, Exs. A & B) pursuant to which ITB agreed to perform certain services (collectively,

the "Services") for Celsius. (Amended Complaint ¶¶ 18–19.) "Services" is defined in the

Agreement as follows:

> Services – [ITB] shall engage in trading strategies in the decentralized
> finance markets, using a variety of cryptoassets conducted on various smart
> contracts and decentralized platforms as well as any additional trading
> strategy mutually agreed to by the Parties (collectively, the "Strategy").
> [ITB] will provide the Services subject to any and all risk parameters and
> other criteria established from time to time by [Celsius].

(Agreement § 1.) In connection with ITB's provision of the Services, Appendix A to the

Agreement provides that Celsius will make available to ITB "initial risk capital of at least

$1,000,000 that [ITB] will use to run the Strategy." (*Id.*, App'x A § 1.) Moreover, as set forth

therein, Celsius "may periodically invest additional amounts in, and make withdrawals from the

allocation to the Strategy at [Celsius's] sole discretion." (*Id.*) As for the management of digital

assets, the Appendix further provides that ITB "shall comply with all policies, procedures and

other safeguards [Celsius] establishes from time to time in connection with the services." (*Id.* §

3.) ITB also "acknowledges that [Celsius] may monitor all of its activities on any application or

any exchange." (*Id.*)

Relevant here, the Agreement makes clear that ITB was an "independent contractor of

[Celsius]" and, therefore, nothing contained in the Agreement was to be "construed to create the

4

relationship of employer and employee, principal and agent, partnership or joint venture, or ***any
other fiduciary relationship***." (Agreement § 5 (emphasis added).) Moreover, the Agreement
also includes an integration clause, which states that the "Agreement, and any accompanying
appendices, duplicates, or copies, constitutes the entire agreement between the Parties with
respect to the subject matter of [the] Agreement, and supersedes all prior negotiations,
agreements, representations, and understandings of any kind, whether written or oral, between
the Parties, preceding the date of [the] Agreement" or October 22, 2020. (*Id.* § 11(c).) Lastly,
the laws of England and Wales govern the Agreement, which neither party disputes. (Agreement
§ 12(a).)

On or about October 2021, Celsius and ITB entered into an amendment of the Agreement
(the "Amendment," Amended Complaint, Ex. B).[2] The Amendment was limited solely to
modification of terms governing ITB's compensation. (*See generally* Amendment.)

### 3. Celsius's Decision to Enter into the Agreement

The Litigation Administrator indicates that Celsius relied on certain statements ITB made
in a September 2020 PowerPoint presentation as well as the parties' "subsequent discussions" in
deciding to enter into the Agreement. (Amended Complaint ¶ 17.) The parties' conversations
concerning the Agreement began in September 2020 when Jesus Rodriguez ("Rodriguez"), Chief
Executive Officer and Chief Technology Officer of ITB, and Johannes Treutler ("Treutler") of
Celsius discussed Celsius's and ITB's entry into a "potential agreement." (*Id.* ¶ 14.)
Subsequently, Rodriguez emailed Treutler a PowerPoint presentation (the "September 2020
Presentation") on September 21, 2020, that set forth "some of the basics of a potential

---

[2]     While the copy of the Amendment provided to the Court is not executed, both the Amended Complaint and
the Motion indicate that Celsius and ITB entered into the Amendment. (*See* Amended Complaint ¶ 21; Motion at
5.)

5

collaboration for the implementation and execution of DeFi strategies." (*Id.* (quoting, without

citation, to presumably either the Rodriguez email or the September 2020 Presentation).) The

Litigation Administrator maintains that Rodriguez outlined "key points" of the parties' potential

partnership, which are as follows:

- ITB will be responsible for the evaluation, implementation, and maintenance of strategies that both parties consider relevant.

- Celsius will allocate capital to the execution of the selected strategies with proceeds from the execution to be split between Celsius and ITB.

- ITB and Celsius will collaborate on the research and design of "DeFi quant strategies."

(*Id.*) Moreover, the September 2020 Presentation indicated that ITB, possessing "[d]ata science

and machine learning expertise" and "[q]uant strategies and risk management knowledge," has

"created a sophisticated strategy and execution for the DeFi market." (*Id.* ¶ 15 (quoting the

September 2020 Presentation).) The Litigation Administrator further maintains that the

September 2020 Presentation provided that "ITB would be responsible for, among other things,

analyzing the viability of quant DeFi strategies, implementing quant DeFi strategies agreed on by

the parties, providing auditing and traceability interfaces for target trades, and maintaining quant

DeFi strategies after . . . deploy[ment]." (*Id.* ¶ 16.)

No copies of the Rodriguez email or the September 2020 Presentation, however, have

been provided to the Court.

### 4. ITB's Investment of Celsius's Crypto Assets

Following entry to into the Agreement, Celsius deposited millions of dollars of

cryptocurrency with ITB—including Bitcoin ("BTC"), Wrapped Bitcoin ("WBTC"), Ethereum

("ETH"), Chainlink ("LINK"), Dai ("DAI"), and USD Coin ("USDC")—which ITB invested in

"various DeFi strategies." (*Id.* ¶ 29.) One such strategy was the deployment of Celsius's digital

assets into DeFi liquidity pools, which ITB defines to be "pools of crypto assets held in a smart

contract to provide liquidity on DeFi platforms." (Motion at 5.) ITB indicates that, while it set

up the relevant smart contracts, it delegated ownership and control of those smart contracts to

Celsius. (*Id.* at 6.)

      The Litigation Administrator contends that ITB maintained custody and control over the

crypto assets, and Celsius could not unilaterally terminate investments or make withdrawals.

(Amended Complaint ¶ 30.) Rather, it argues, only ITB possessed the ability to so.[3] (*Id.*) ITB

disputes this, stating instead that ITB was not permitted to do anything that was "not already

predetermined in the smart contract without Celsius's instruction and approval." (Motion at 6.)

      5.  The May 2021 Presentation and Strategy Document

      The Litigation Administrator highlights a PowerPoint presentation ITB prepared after the

parties' entry into the Agreement, entitled "IntoTheBlock – Celsius: A Vision for a Strategic

Alliance," that set forth an overview of the parties' relationship as of that date (the "May 2021

Presentation"). (Amended Complaint ¶ 31.) The May 2021 Presentation, the Litigation

Administrator indicates, made explicit that ITB's "vision" was to "[e]nable intelligent asset

management capabilities for the digital assets market." (*Id.* (quoting the May 2021

Presentation).) The May 2021 Presentation also defined ITB's "quant services" as "[a]n engine

for producing deep-learning based price prediction models (CeFi) and onchain trading strategies

(DeFi) to power the trading activity of the most sophisticated quant funds in the market." (*Id.*

(quoting the same).) In addition to the foregoing, several benefits of ITB's services were also

---

[3]     It is unclear what the Litigation Administrator's allegation is predicated on. Appendix A to the Agreement
sets forth limitations only with respect to ITB in connection with the management of Celsius's digital assets.
Specifically, section 3 restricts ITB from, among other things, (i) transferring Celsius's assets to a blockchain
network that is not under Celsius's control, and (ii) seeking to withdraw any of Celsius's assets or fiat currency from
any cold wallet or exchange without Celsius's prior written approval. (Agreement, App'x A. § 3.)

noted in the presentation, including risk management and the implementation of quant strategies tailored to each client.  (*Id.* ¶¶ 32–33.)

The May 2021 Presentation indicated that the current stage in the "multi-phase alliance" between ITB and Celsius was "Celsius Intelligent Asset Management."  (*Id.* ¶ 34; *see also id.* ¶ 35 (noting that the presentation also described ITB's quant services as representing a "complementary ***asset management*** offering for Celsius's services" and would provide Celsius with "diversified yield exposure across multiple protocols and tokens") (emphasis in original).)

Aside from the presentation, the Litigation Administrator also highlights a May 2021 strategy document ITB provided where ITB stated that its objective was "[t]o ***generate returns*** for Celsius'[s] treasury via IntoTheBlock's DeFi Passive Strategies."  (*Id.* ¶ 36 (quoting the strategy document) (emphasis in original).)  As set forth therein, ITB indicated that it "leverages its robust infrastructure and blockchain/smart contract expertise to test, build, run, and monitor strategies on trusted DeFi Protocols.  In Celsius'[s] case, the strategies used are passive (no active trading), high capacity, and very low risk."  (*Id.* (quoting the same).)  To carry out the foregoing, ITB stated that it "monitors protocol-specific and exogenous risks and has mechanisms in place to automatically exit positions if certain risk criteria are met."  (*Id.* (quoting the same).)

The Litigation Administrator asserts that Celsius relied on the statements ITB made in the May 2021 Presentation and the strategy document in (i) maintaining its existing investments with ITB and (ii) deciding to provide additional cryptocurrency to ITB for ITB to manage and invest. (*Id.* ¶ 39.)

6.  <u>The Investments and the January 2022 Liquidation Event</u>

ITB invested amWBTC, an interest-bearing token that the Litigation Administrator indicates represents WBTC, in the Curve Polygon liquidity pool on behalf of Celsius.[4]  (*Id.* ¶ 41.)  ITB's investment of Celsius's assets in the Curve Polygon liquidity pool was subject to a smart contract[5] that would "automatically disassemble the investment" under certain circumstances.  (*Id.* ¶ 42; Motion at 2.)

On January 13, 2022, a third party made large withdrawals from the same liquidity pool in which ITB invested Celsius's amWBTC that, at the time, amounted to approximately 120 amWBTC.  (Amended Complaint ¶¶ 41, 43.)  The Litigation Administrator indicates that the liquidity pool lacked any mechanism to "rebalance itself" after the withdrawals.  (*Id.* ¶ 43.)  As a result, the smart contract disassembled Celsius's position, resulting in Celsius incurring an exit fee of approximately 75% or a loss of 90 amWBTC that amounted to roughly $3.8 million at the time.  (*Id.*)

The Litigation Administrator maintains that Celsius was unaware of the disassembling mechanism.  (*Id.* ¶ 44.)  Moreover, it argues that Celsius would not have agreed to "invest in any strategy, including the Curve Polygon liquidation pool, if it had known that ITB's algorithm could cause it to incur a 75% exit fee."  (*Id.*)

---

[4]    WBTC is defined to be an "Ethereum-based token that is pegged to the value of Bitcoin."  (Amended Complaint at 2 n.2.)

[5]    The Motion states that, despite the Amended Complaint's reference to an "algorithm," the phrase "smart contract" is the proper terminology to be used when referencing the disassembling software.  (Motion at 5 n.5.)  The Plaintiff appears to agree, stating in its Opposition that it was the "smart contract" that disassembled the investment. (Opposition at 5 (arguing that the "smart contract disassembled the investment due to circumstances that ITB knew was [sic] in error"); *see also id.* at 1 (asserting that ITB "admitted that its smart contract performed in gross error"); *id.* at 17 (discussing the "smart contract" and the "algorithm embedded in[] it"); *id.* at 18 n.8 (alleging that ITB provided a "faulty design for its smart contract—one that failed to take into consideration a fundamental risk of pool investments").)

7.   <u>The Aftermath</u>

The Litigation Administrator alleges that ITB "clearly recognized that the investment strategy did not work as . . . expected" as ITB "immediately tried to obscure what occurred," failing to report the loss to Celsius right away.  (*Id.* ¶ 45.)  In support, the Litigation Administrator highlights a January 17, 2022 weekly report ITB provided to the Celsius finance team, four days after the liquidation event, that did not mention the incident and, instead, "falsely reported an unimpaired balance."  (*Id.*)  This omission, the Litigation Administrator believes, was intentional.  (*Id.*)

Celsius did not learn of the 90 amWBTC loss, the Litigation Administrator indicates, until January 19, 2022, when ITB "finally informed Celsius" during a "routine, weekly call." (*Id.* ¶ 46.)  Following the call, ITB provided Celsius an incident report that contained "scant details about the incident and no explanation of why the algorithm . . . triggered the withdrawal of Celsius'[s] investment."  (*Id.*)  A copy of the incident report is annexed to the Rodriguez Decl. as Exhibit A (the "Incident Report," ECF Doc. # 24, Ex. A).  The Incident Report sets forth, among other things, the relevant transactions as follows: (i) the removal of 93 amWBTC and 139 renBTC; (ii) a swap of 45 renBTC to amWBTC; and (iii) ITB's detection of an "exit fee > 1%" or 75.2523% and the triggering of disassembly.  (Incident Report at 5.)

On January 26, 2022, Rob Sabo ("Sabo"), Head of Research at Celsius, had a call with Rodriguez and two other ITB employees regarding the January 13 incident during which Rodriguez indicated that ITB was "investigating" and would provide Celsius with an analysis and measures it would institute to avoid similar future incidents from occurring.  (Amended Complaint ¶ 47.)  Meanwhile, Sabo informed ITB that Celsius wanted to withdraw all funds placed with ITB until it fully understood what happened and "could be assured that a similar disassembly would not be repeated."  (*Id.* ¶ 48.)  The Litigation Administrator alleges that

Rodriguez and his colleagues were "not transparent" and "intentionally opaque" during the call

and failed to explain why the ITB smart contract disassembled Celsius's position "at such a huge

loss." (*Id.* ¶ 47.)

In a follow-up call, Rodriguez asked Sabo to reconsider withdrawing all of Celsius's

funds, stating that he was working on a "very aggressive financial package" to remedy the

situation. (*Id.* ¶ 48.) Subsequently, Rodriguez messaged Sabo via Slack with "[i]mmediate

[s]teps" ITB intended to take. (*Id.* ¶ 49.) Specifically, ITB would provide Celsius with (i) an

analysis that shows the 1% of liquidity Celsius holds in any liquidity pool or market[6];

(ii) technical enhancements to the existing "Curve strategies" to prevent similar scenarios;

(iii) detailed analysis of other transactions relevant to the Curve Polygon liquidity pool; and

(iv) details regarding a financial remediation plan and potential contractual changes, all of which

ITB intended to make "extremely beneficial for Celsius." (*Id.*)

On January 27, 2022, Rodriguez emailed Sabo and stated that ITB was working towards

"financial remediation" and wanted to have an "opportunity to fix the situation with Celsius."

(*Id.* ¶ 51 (quoting the January 27, 2022 email).) ITB also offered to not charge fees to Celsius

during the first and second quarters of 2022 "for any type of strategy existing or new," indicating

that it would result in approximately $1 million in savings "in addition to return." (*Id.*) The

Litigation Administrator maintains that, despite its promises to do so, ITB again failed to explain

why its smart contract disassembled Celsius's position in the Curve Polygon liquidity pool or

provide adequate assurances that similar incidents would not reoccur. (*Id.* ¶ 52.) Accordingly,

---

[6]    While not set forth in the Amended Complaint, ITB indicates that the prior iteration of the Amended
Complaint stated that disassembling (*i.e.*, the withdrawal of crypto assets from the liquidity pool) was to occur if the
"algorithm . . . detected **another** withdrawal that occurred at an exit fee of 1% or greater." (Motion at 7 (quoting the
original complaint) (emphasis in original).)

Celsius rejected ITB's offer, refusing to be "'paid off' for an amount far below the damages that it had incurred." (*Id.* ¶¶ 3, 52)

On February 1, 2022, Sabo instructed ITB to withdraw all investments ITB was managing on Celsius's behalf across multiple DeFi strategies, which the Litigation Administrator indicates amounted to approximately $250 million of cryptocurrency at the time. (*Id.* ¶¶ 40, 53.) In accordance with Celsius's request, ITB withdrew Celsius's remaining crypto assets and returned the assets to Celsius. (*Id.* ¶ 53.) The Litigation Administrator indicates, however, that ITB returned only approximately 30 of the 120 WBTC that Celsius had deposited with ITB. (*Id.* ¶ 85.)

Following Celsius's withdrawal, ITB refused to compensate Celsius for its losses, and the Litigation Administrator indicates that Celsius remains "uncompensated" for losses it incurred as a result of ITB's conduct, which, at the time of the incident, amounted to approximately $3.8 million. (*Id.* ¶ 4.)

**B. The Adversary Complaint**

On November 1, 2024, the Litigation Administrator filed the Amended Complaint against ITB, commencing an action for breach of fiduciary duty, breach of contract, negligence, gross negligence, and turnover. (*Id.* ¶ 1.) Annexed to the Amended Complaint are (i) a copy of the initial Agreement as Exhibit A and (ii) a copy of the Amendment as Exhibit B.

Central to several of the asserted causes of action is the Litigation Administrator's allegation that ITB operated as an unregistered investment adviser to Celsius within the meaning of the Investment Advisers Act of 1940, 15 U.S.C. § 80b-2 (the "IAA"). (*Id.* ¶¶ 23–25, 28; *see also id.* ¶ 38 (pointing to statements in the May 2021 Presentation and the strategy document that it believes demonstrate that ITB was acting as an investment adviser to Celsius); *id.* ¶ 50 (arguing that ITB's proposed "immediate steps" affirmed that ITB had investment discretion and

12

was providing investment advice and/or asset management services to Celsius).)  Specifically,

the Litigation Administrator argues that ITB's engagement in crypto transactions on behalf of

Celsius constitutes an "investment contract" as that term is defined under the IAA, and therefore

falls within the IAA's definition of "security."  (*Id.* ¶¶ 24–25.)  To support its contention, the

Litigation Administrator highlights that the Services ITB provided are the "hallmarks" of an

investment adviser and notes further that ITB's compensation was tied to the performance of

investment strategies it managed.  (*Id.* ¶¶ 26–27.)

As an investment adviser, the Litigation Administrator believes that ITB served as a

fiduciary to Celsius and, as a result, was obligated to disclose material information.  (*See id.* ¶ 45

(arguing that ITB was obligated to immediately report the January 13 loss to Celsius as it was a

fiduciary); *id.* ¶ 50 (suggesting that ITB's provision of the Services "rendered it an investment

adviser with fiduciary duties that it failed to fulfill").)

The Amended Complaint asserts five causes of action:

- Count I – A claim for breach of the fiduciary duty ITB owed to Celsius as an investment adviser and asset manager for ITB's (i) investment of Celsius's assets that resulted in a 75% loss; (ii) failure to disclose material risks of its investment and asset management strategies; and (iii) failure to immediately report the loss.  (*Id.* ¶¶ 54–61.)

- Count II – A claim for breach of the Agreement for ITB's failure to institute appropriate risk parameters in its investment and management of Celsius's assets under the laws of England and Wales.  (*Id.* ¶¶ 63–68; *id.* at 17–18.)

- Count III – A claim for gross negligence in connection with ITB's alleged breach of its fiduciary duty owed to Celsius under the laws of England and Wales.  (*Id.* ¶¶ 69–74; *id.* at 18.)

- Count IV – A claim for negligence in connection ITB's alleged breach of its fiduciary duty owed to Celsius under the laws of England and Wales.  (*Id.* ¶¶ 75–78; *id.* at 18.)

- Count V – A claim for entry of a judgment ordering ITB to turn over 90 WBTC and all related proceeds, rents, or profits (or their equivalent value)—which allegedly constitute debt or property that the trustee may use, sell, or lease and remains outstanding— pursuant to section 542(b) of the Bankruptcy Code.  (*Id.* ¶¶ 79–90.)

In connection with the foregoing, the Litigation Administrator seeks entry of an order (i) awarding damages in an amount to be proven at trial but no less than the value of 90 BTC in connection with Counts I, II, III, and IV; (ii) directing ITB to turn over 90 BTC and any and all proceeds to Celsius in connection with Count V; (iii) awarding costs and fees to the extent appropriate, including reasonable attorneys' fees; and (iv) such other relief the Court deems just and equitable.[7]  (*Id.* at 18.)

### C.  The Motion

The Motion seeks dismissal of all counts asserted in the Amended Complaint with prejudice on grounds that the limitation of liability clause in the Agreement—that, by its own terms, encompasses all claims in the Amended Complaint—limits ITB's liability for indirect damages, which is "all that Celsius seeks here."  (Motion at 3, 10.)  ITB notes that the Litigation Administrator does not seek to hold Celsius responsible for amounts directly owed under the Agreement but rather for alleged losses resulting from the exit fee.  (*Id.* at 10.)

Moreover, each of the Amended Complaint's five causes of action, ITB maintains, "independently fail to state a claim" and should be dismissed.  (*Id.* at 3.)  With respect to Count I, ITB argues that dismissal of the breach of fiduciary duty claim is appropriate as the Litigation Administrator fails to adequately plead facts that establish that (i) the transactions at issue constitute securities, a requirement to implicate the IAA; (ii) ITB meets the statutory definition of an "investment adviser" and, in fact, Celsius disclaimed that ITB was acting as a fiduciary; and (iii) ITB breached any duty since, among other things, Celsius agreed to the Strategy and the Litigation Administrator has not pointed to any false statement ITB made.  (*Id.* at 3, 10–11, 15;

---

[7]     While the Amended Complaint's prayer for relief indicates that the amount of damages sought is to be no less than "the value of 90 BTC," each of the individual counts specifies a value of "90 WBTC."  (*See* Amended Complaint ¶¶ 62, 68, 74, 78, 90.)  As noted, however, the value of WBTC is pegged to the value of BTC, which signifies a 1:1 ratio in value.

*see also id.* at 4 (stating matter of factly that "ITB is not a finance company, and certainly is not an investment adviser").)

Moreover, in ITB's mind, Count II should also be dismissed because the Litigation Administrator has not pled breach of any contractual obligation. (*Id.* at 16.)  Specifically, the smart contract, ITB states, operated as "anticipated" (*i.e.*, disassembling Celsius's position after the exit fee rose above 1%), and the Amended Complaint does not otherwise point to any specific provision in the Agreement that was violated. (*Id.* at 3, 16–17.)  In addition, ITB argues that nothing in the Agreement makes ITB responsible for trading losses, and consideration of the September 2022 and May 21 Presentations and other communications that Celsius allegedly relied on is barred by the Agreement's merger clause and/or do not support the Litigation Administrator's position. (*Id.* at 3, 17–18.)

ITB also argues that the Litigation Administrator's gross negligence and negligence claims—which comprise Counts III and IV, respectively—should be dismissed because they are barred by the "economic loss" doctrine (or the English law equivalent) and are otherwise insufficiently pled. (*Id.* at 4, 18.)  With respect to the former, the Litigation Administrator, ITB argues, does not allege physical or property damage, only economic loss. (*Id.* at 19.)  As to the latter, ITB indicates that the Litigation Administrator's claim for negligence, gross or otherwise, fails because (i) as an initial matter, it did not owe Celsius any duty; and  (ii) the Litigation Administrator failed to allege breach of any "viable" duty or that such alleged breach was the proximate cause of Celsius's alleged loss. (*Id.* at 20–22.)  The Litigation Administrator's claim for gross negligence also fails, ITB asserts, because the Amended Complaint lacks any facts that illustrate a "gross deviation" from reasonable standards of care, a higher standard than mere negligence. (*Id.* at 22–23.)

Finally, the claim for turnover similarly fails for two reasons, ITB argues. *First*, the Amended Complaint lacks any allegation that ITB held the lost 90 WBTC at the time of the January 13 liquidity event or is currently holding the tokens. (*Id.* at 4.) Instead, the Amended Complaint pleads facts that demonstrate that these tokens were used to pay the liquidity pool's exit fee such that ITB is not and was not holding Celsius's property on January 13. (*Id.* at 23–24.) *Second*, at its core, the turnover claim is nothing more than a "masked claim" for market losses for which no repayment obligation exists, seeking recovery of a disputed pre-petition debt, which cannot serve as the basis of a turnover claim. (*Id.* at 4, 24.)

### D. The Opposition

The Litigation Administrator opposes the relief sought and argues that the Motion should be denied. As an initial matter, the Litigation Administrator argues that ITB improperly submitted its own version of the facts, which it cannot do and requests that the Court "strike all facts unrelated to the Amended Complaint" that are asserted on pages 4 through 7 of the Motion. (Opposition at 2 n.2.) ITB's actions, it maintains, "demonstrate[] an aversion to the truth," and the Court should therefore "disregard the facts asserted by the Defendant in their entirety." (*Id.* at 3, 5.)

Turning to specific arguments ITB has put forth, the Litigation Administrator first argues that the limitation of liability clause under the Agreement does not bar its claims as the provision does not "explicitly and unequivocally state which liabilities and obligations . . . are subject to the cap (or caps) and the extent of such limitation" as required under governing English law. (*Id.* at 7–8, 10.) Under English law, the Litigation Administrator argues, there is a presumption that neither party to a contract intends to abandon any remedies which would otherwise be available to it at law. (*Id.* at 7.) In particular, it notes that the plain language of the clause makes "clear" that parties did not intend to exclude claims for direct damages, and the Court should not

16

otherwise read a waiver or limitation into the Agreement.  (*Id.* at 10.)  Its damages, it argues, are

not "remote or tangential," but rather, are based on "specific conduct due to a particularized

investment strategy designed and implemented by Defendant."  (*Id.* at 22.)

Moreover, the Litigation Administrator contends that the limitation of liability clause,

when read in conjunction with the Agreement's indemnification provision, makes "clear" that

"the Agreement permits claims to be brought against ITB that arise or relate to its bad faith,

gross negligence, or willful misconduct in the performance of Defendant's duties."  (*Id.* at 9.)

ITB's argument, it states, "lacks commercial sense" and a "more reasonable reading of the

circumstances" would be that Celsius did not intend to cap ITB's liability.  (*Id.* at 10–11.)

As for the Amended Complaint itself, the Litigation Administrator asserts that it has

adequately pled (i) a claim for breach of fiduciary duty, since it has sufficiently pled that digital

assets are securities and ITB is an investment advisor under the IAA whose fiduciary duties

cannot be waived (*id.* at 11–15); (ii) a claim for breach of contract, since it has pled facts

concerning the obligations of each party, ITB's breach of its duties by investing Celsius's assets

into the Curve Polygon liquidity pool, and Celsius's entitlement to direct damages from ITB (*id.*

at 15–17); and (iii) a claim for gross negligence, which the Litigation Administrator indicates is,

under English law, "more than a fundamental failure to exercise proper skill or care" (*id.* at 18).

With respect to the claim for gross negligence in particular, the Litigation Administrator

also notes the absence of clear English authority on the question of "whether designing financial

trading software with insufficient risk management capabilities constitutes gross negligence."

(*Id.*)  Therefore, dismissal at the pleading stage, it argues, would be premature, and the Court

should otherwise adopt the Litigation Administrator's proposed framework for assessing its

allegations that it believes the Amended Complaint satisfies. (*Id.* at 19.) This proposed

framework is as follows:

> 1.      Duty of care: A software designer or developer working on financial trading systems owes a duty of care to clients or end users, particularly if the software is critical to managing financial risks and has the potential to cause significant losses.
>
> 2.      Breach of Duty: The trading system would be deemed negligently designed if it fails to include essential risk management features that are industry-standard or reasonably expected. A breach may become gross negligence if the omission reflects reckless disregard for the risks involved, such as ignoring clear warnings or failing to conduct adequate testing.
>
> 3.      Foreseeable Risk of Harm: Financial trading software inherently deals with significant financial risks. The lack of risk management capabilities that foreseeably could lead to substantial financial losses strengthens a claim of gross negligence.
>
> 4.      Critical Factors Suggesting Gross Negligence: (i) Failing to address identified issues during development or testing phases, including if ITB were aware that insufficient risk management features could lead to catastrophic trading errors and still proceeded without remediation; (ii) ignoring established regulatory requirements or industry standards; or (iii) knowingly designing the software with glaring vulnerabilities or omissions.

(*Id.*) Additionally, English law, it argues, only recognizes economic loss absent physical or

property damage where a "special relationship exists between the parties" as it does here. (*Id.* at

21.) Therefore, the Litigation Administrator believes it has pled sufficient facts to establish

claims for both negligence and gross negligence. (*Id.* at 22.)

### E.  The Reply

On January 28, 2025, ITB filed the Reply in further support of the Motion, reiterating that

dismissal with prejudice is appropriate since "Celsius has no claims against ITB." (Reply at 2.)

It argues that the Litigation Administrator attempts to use the "'plausibility' standard to

legitimize clearly erroneous statements as fact to be accepted as true merely to survive the

motion to dismiss stage." (*Id.*) In any event, ITB believes that the Litigation Administrator has

not satisfied the plausibility standard that Rule 12(b)(6) of the Federal Rules of Civil Procedure requires and argues that its legal conclusions, "dressed up as factual allegations[,] should be given no weight."  (*Id.*)

ITB further argues that the Agreement and its terms are "integral" and should be given effect, consideration of which would support a dismissal of the Amended Complaint.  (*Id.* at 3.) Specifically, the Amended Complaint, it reiterates, seeks only indirect, incidental, and consequential damages, all of which fall within the scope of the liability limitation clause, and does not seek amounts directly owed by ITB under the Agreement.  (*Id.* at 3.)  Moreover, any allegations concerning communications not incorporated in the Agreement cannot be considered in light of the Agreement's merger clause and/or do not otherwise support the Litigation Administrator's assertions.  (*Id.*)

With respect to Count I, the Litigation Administrator's breach of fiduciary duty claim, ITB asserts that the Opposition fails to rebut dismissal and notes again that the Amended Complaint fails to adequately plead that (i) ITB was acting as an investment adviser; (ii) any of digital assets at issue are securities and were transacted as part of an investment contract; and (iii) there was a breach of any fiduciary duty as it is "unfathomable" that Celsius would have agreed to a strategy that would lead to a foreseeable loss.  (*Id.* at 4–7.)  Along a similar vein, ITB argues that, with respect to Count II, the breach of contract claim, the Litigation Administrator continues to be unable to point to any provision of the Agreement that was breached or plead sufficient facts that ITB acted unfairly or not in good faith, duties that English law does not even recognize.  (*Id.* at 7–9 (noting that English law does not recognize any general implied duty of good faith and fair dealing).)  Therefore, ITB believes that dismissal of Counts I and II is appropriate.

Counts III and IV, which assert claims of gross negligence and negligence, respectively, should also be dismissed, ITB contends, because they are insufficiently pled and are barred by English law.  (*Id.* at 9.)  Among other things, ITB believes that it did not owe Celsius any duty and any losses were remote and unforeseeable.  (*Id.* at 9–10.)  Rather, the Strategy worked as contemplated and designed such that dismissal of Counts III and IV is warranted.  (*Id.* at 10.)

As for Count V, the last remaining cause of action that asserts a claim for turnover, the Opposition does not address ITB's arguments whatsoever, which ITB insists constitutes a waiver and renders dismissal of that count appropriate.  (*Id.*)

## II.   <u>LEGAL STANDARD</u>

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, made applicable to adversary proceedings by Rule 7012 of the Federal Rules of Bankruptcy Procedure, a complaint need only allege "enough facts to state a claim for relief that is ***plausible*** on its face."  *Vaughn v. Air Line Pilots Ass'n, Int'l*, 604 F.3d 703, 709 (2d Cir. 2010) (emphasis in original) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  A party need only plead "a short and plain statement of the claim" with sufficient factual "heft to sho[w] that the pleader is entitled to relief."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007) (internal quotation marks and citations omitted).  Under this standard, the pleading's "[f]actual allegations must be enough to raise a right to relief above the speculative level," *id.* at 555, and present claims that are "plausible on [their] face," *id.* at 570.

"Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief."  *Off. Comm. of Unsecured Creditors of Vivaro Corp. v. Leucadia Nat'l Corp. (In re Vivaro Corp.)*, 524 B.R. 536, 547 (Bankr. S.D.N.Y. 2015) (quoting *Iqbal*, 556 U.S. at 678).  Plausibility "is not akin to a

20

probability requirement," but rather requires "more than a sheer possibility that a defendant has

acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation and internal quotation marks omitted).

"Threadbare recitals of the elements of a cause of action, supported by mere conclusory

statements, do not suffice." *Id.* (citations omitted); *see also Twombly*, 550 U.S. at 555 (stating

that a pleading that offers "labels and conclusions, and a formulaic recitation of the elements of a

cause of action will not do").  Rather, pleadings "must create the possibility of a right to relief

that is more than speculative." *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 183

(2d Cir. 2008) (citation omitted).  "A claim has facial plausibility when the pleaded factual

content allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged." *Iqbal*, 556 U.S. at 663 (citing *Twombly*, 550 U.S. at 556).

Generally, courts use a two-pronged approach when considering a motion to dismiss.

*Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt.*, 712 F.3d 705, 717 (2d Cir. 2013)

(stating that motion to dismiss standard "creates a 'two-pronged approach' . . . based on '[t]wo

working principles'") (alterations in original) (quoting *Iqbal*, 556 U.S. at 678–79)); *McHale v.

Citibank, N.A.* (*In re 1031 Tax Grp., LLC*), 420 B.R. 178, 189–90) (Bankr. S.D.N.Y. 2009)

(stating that courts use a two-prong approach when considering a motion to dismiss).  *First*, a

court must accept all factual allegations in the complaint as true, discounting legal conclusions

clothed in factual garb.  *See, e.g.*, *Iqbal*, 556 U.S. at 677–78; *Kiobel v. Royal Dutch Petroleum

Co.*, 621 F.3d 111, 124 (2d Cir. 2010) (stating that a court must "assum[e] all well-pleaded,

nonconclusory factual allegations in the complaint to be true") (citing *Iqbal*, 556 U.S. at 678).

*Second*, a court must determine if these well-pleaded factual allegations state a plausible claim

for relief—"a context-specific task that requires the reviewing court to draw on its judicial

experience and common sense." *Iqbal*, 556 U.S. at 679 (citation omitted).  "Dismissal is only

warranted where it appears beyond doubt that the plaintiff can prove no sets of facts in support of her claim which would entitle her to relief." *Geron v. Central Park Realty Holding Corp. (In re Nanobeak Biotech Inc.)*, 656 B.R. 350, 361 (Bankr. S.D.N.Y. 2024) (citation omitted).

Courts deciding motions to dismiss must draw all reasonable inferences in favor of the nonmoving party and must limit their review to facts and allegations contained in (i) the complaint; (ii) documents either incorporated into the complaint by reference or attached as exhibits; and (iii) matters of which the court may take judicial notice—such as public records, including complaints filed in state courts. *Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide Inc.*, 369 F.3d 212, 217 (2d Cir. 2004) (citations omitted).

## III.    DISCUSSION

### A.  The Limitation of Liability Clause Does Not Support Dismissal

As an initial matter, ITB argues that the Court must dismiss the Amended Complaint in its entirety as the relief it seeks is barred by the limitation of liability clause set forth in section 8 of the Agreement.  Specifically, the provision provides:

> EXCEPT WITH RESPECT TO THE PARTIES' INDEMNIFICATION OBLIGATIONS, NEITHER PARTY SHALL BE LIABLE TO THE OTHER FOR ANY SPECIAL, INDIRECT, INCIDENTAL, PUNITIVE, OR CONSEQUENTIAL DAMAGES ARISING FROM OR RELATED TO THIS AGREEMENT, INCLUDING BODILY INJURY, DEATH, LOSS OF REVENUE, OR PROFITS OR OTHER BENEFITS, AND CLAIMS BY ANY THIRD PARTY, EVEN IF THE PARTIES HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.  THE FOREGOING LIMITATION APPLIES TO ALL CAUSES OF ACTION IN THE AGGREGATE, INCLUDING WITHOUT LIMITATION TO BREACH OF CONTRACT, BREACH OF WARRANTY, NEGLIGENCE, STRICT LIABILITY, AND OTHER TORTS.

(Agreement § 8.)  The provision carves out "special, indirect, incidental, punitive, or consequential damages" stemming from or relating to the Agreement "***even if*** the parties have been advised of the possibility of such damages."  (*Id.* (emphasis added).)  Non-exhaustive

examples set forth therein, include, among others, "loss of revenue, or profits or other benefits."

(*Id.*)  Notably, the limitation applies to "***all*** causes of action in the aggregate," including, as

applicable here, breach of contract and negligence.  (*Id.* (emphasis added).)

The Litigation Administrator and ITB are not in dispute that, under English law, while

"parties may contract to limit their liabilities . . . general exculpatory clauses will not bar

recovery for damage[s] resulting from intentional, negligent or reckless misconduct unless it is

clear that the parties intended that result."[8]  *Medline Indus. Inc. v. Maersk Med. Ltd.*, 230 F.

Supp. 2d 857, 869 (N.D. Ill. 2002).  (*See* Motion at 10 (quoting *Medline* for the proposition that a

contractual limitation on liability clause will bar claims so long as parties clearly intended for

such); Opposition at 8 (quoting the same).)  The *Medline* court explained that a "clear expression

of the parties' intent, either expressly or by implication, is required" since it would be

---

[8]       Neither party has proffered affidavits as to the applicable governing standard under English law, citing only
to what they believe are the instructive English cases and/or U.S. cases applying English law in their papers.  Rule
44.1 of the Federal Rules of Civil Procedure provides that, in determining foreign law, a court "may consider any
relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal
Rules of Evidence."  FED. R. CIV. P. 44.1; *see* FED. R. BANKR. P. 9017 (making Rule 44.1 of the Federal Rules of
Civil Procedure applicable to adversary proceedings).  Indeed, the Second Circuit has urged district courts to
"invoke the flexible provisions of Rule 44.1 to determine issues relating to the law of foreign nations."  *Curley v.
AMR Corp.*, 153 F.3d 5, 13 (2d Cir. 1998).

Accordingly, where parties are in consensus, the Court may adopt, as it has here, what the parties have
determined to be the applicable English law standard or make its own independent determination for purposes of this
Opinion.  *See Loebig v. Larucci*, 572 F.2d 81, 85 (2d Cir. 1978) (noting that Rule 44.1 of the Federal Rules of Civil
Procedure permits parties to present information on foreign law and, although not mandatory, the court may make its
own determination of foreign law based on its own research); *cf. SmartStream Tech., Inc. v. Chambadal*, No. 17-
CV-2459 (VSB), 2018 WL 1870488, at *4 (S.D.N.Y. Apr. 16, 2018) (adopting a plaintiff's "application of the
proffered English law" given the defendant's silence, which the court took to be "acquiescence").

In instances, however, where parties have not articulated what the governing standard should be under
English law, the Court will make its own pronouncement.  *Loebig*, 572 F.2d at 85.  Note that it is generally assumed
that "[i]n cases involving the law of common law countries . . . foreign law is the same as New York law."  *Id.*
Further, where "there is no presumption that New York law is the same as foreign law and no evidence has been
presented as to foreign law, New York courts have decided the cases in accordance with New York law," the law of
the forum court.  *Id.*; *see e.g.*, *Goldin v. Primavera Familienstiftung (In re Granite Partners, LP)*, 194 B.R. 318, 324
n.9 (Bankr. S.D.N.Y. 1996) (indicating that the court would "also apply American law to resolve [the] issue" since
neither party submitted any specific authority); *Dataserv, Ltd. v. Mgmt. Tech., Inc.*, No. 90 Civ. 7759 (SWK), 1993
WL 138852, at *4 (S.D.N.Y. Apr. 27, 1993) (applying New York law where no evidence was offered to show that
English law differed from New York law).

"inherently improbable that one party to the contract should intend to absolve the other party

from the consequences of the latter's own negligence or misconduct." *Medline*, 230 F. Supp. 2d

at 869 (quoting *Lamport & Holt Lines Ltd. v. Coubro & Scrutton*, [1982] Lloyd's Rep. 42

(C.A.)) (internal quotation marks omitted).

 Here, the parties are in accord that the limitation of liability clause bars "special, indirect,

incidental, punitive, or consequential damages" that arise from or relate to the Agreement.

(Agreement § 8; *see* Motion at 3 (stating that the limitation of liability provision "completely

limits ITB's liability for indirect damages"); Opposition at 5, 10 (arguing that the clause "only

covers special categories of damages, such as special, indirect, punitive, or consequential

damages" and "[does] not waive direct damages").) Where they are at odds, however, is whether

the Amended Complaint seeks direct or indirect damages, the latter of which the limitation of

liability clause indisputably encompasses by its plain language. Specifically, ITB asserts that the

Amended Complaint seeks only "indirect, incidental, and consequential damages" as it attempts

to hold "ITB responsible for Celsius's alleged losses resulting from the exit fee" as opposed to

"amounts directly owed under the Agreement."[9] (Motion at 10; *see also id.* at 3 (stating that the

limitation of liability provision "completely limits ITB's liability for indirect damages"); Reply

at 3 (arguing the same).) Meanwhile, the Litigation Administrator, without addressing ITB's

contention, states only that it is entitled to "recover direct damages from Defendant," which it

then argues fall outside the scope of the limitation of liability clause and are, therefore, not

---

[9] Note that the Motion states that the Amended Complaint, which was filed by the Litigation Administrator
on behalf of *Celsius*, is seeking indirect damages because it does not seek to hold "***Celsius*** responsible for any
amounts directly owed under the Agreement." (Motion at 10 (emphasis added).) The Reply, however, clarifies
ITB's position, stating instead that indirect damages are being sought because "Celsius does not seek amounts
directly owed by ***ITB*** under the Agreement." (Reply at 3 (emphasis added).) It further argues that "Celsius [does
not] state any law that would support its theory that [it] would be entitled to recoup previous fees paid to ITB due to
a loss caused by a third-party's actions in the open market." (*Id.*) Thus, for purposes of this Opinion, the Court
presumes that the argument set forth in the Reply governs.

barred.  (*See* Opposition at 16 (stating also that ITB's "grossly ineffective design,

implementation, and monitoring of the smart contract, its algorithm, and the risk associated with

the Pool resulted in Plaintiff's loss").)

Neither the Litigation Administrator nor ITB, however, has set forth what constitutes

direct or indirect damages under English law.  In the breach of contract context, English law

provides that:

> As is well known, a party seeking to recover damages . . . can recover under
> two broad categories of loss pursuant to the rule in *Hadley v. Baxendale*
> [1854] 9 EXCH 341.  The first category, or limb, encompasses losses which
> are the direct and natural consequence of the breach.  The second category
> or limb encompasses indirect losses which do not arise in the natural course
> of events, but which were nevertheless within the contemplation of the
> parties to the contract at the time that the contract was entered into.

*Elvanite Full Circle Ltd v. AMEC Earth & Env't (UK) Ltd*. [2013] EWHC (TCC) 1191 (Eng. &

Wales).  Typically, "the cost of putting right the thing itself, such as the cost of remedial works

or the cost of replacement, was thought to fall within the first limb, whilst claims which arise out

of the contracting parties' knowledge that any breach would have particular consequences . . .

[come] under the second limb." *Id.*  Claims for loss of profits will usually fall within the "second

limb." *Id.*

New York law is no different.  Breach of contract damages under New York law

typically fall in one of two categories: (i) "general," which is synonymous with "direct"

damages; or (ii) "consequential," which is synonymous with "special" and "indirect" damages.

*Glob. Crossing Telecomms., Inc. v. CCT Commc'ns., Inc. (In re CCT Commc'ns., Inc.)*, 464 B.R.

97, 116–17 (Bankr. S.D.N.Y. 2011).  The former comprise of damages that "flow naturally and

probably from the breach" and "provide the aggrieved party with the difference between the

price he agreed to pay and the value he was to receive through performance." *Id.* at 116

(citations omitted).  The latter, in contrast, comprise of damages aimed at "compensat[ing] a

plaintiff for additional losses (other than the value of the promised performance) that are incurred as a result of the defendant's breach." *Id.* at 117 (quoting *Schonfeld v. Hilliard*, 218 F.3d 164, 175, 176 (2d Cir. 2000)).  Thus, "consequential" or "indirect" damages under New York law focus on the "benefits that the performance will produce or the losses its absence may cause" as opposed to the present value of the promised performance.  *Id.*; *see also id.* ("In simplest terms, '[g]eneral damages measure the losses in the very thing to which the plaintiff is entitled . . . [while c]onsequential damages measure . . . the income it can produce or the losses it can avoid.'" (alterations in original) (quoting 1 DAN B. DOBBS, LAW OF REMEDIES § 3.3(4), at 304 (1993))).

Ultimately, under both English and New York law, determination of what constitutes "direct" versus "indirect" damages is a question of fact.  *See Elvanite Full Circle* [2013] EWHC (TCC) 1191 ("[I]t is a question of fact as to what, in every case, can be regarded as the direct and natural consequence of the breach and what is recoverable only because of the particular knowledge of the contracting parties at the time that the contract was made."); *American Elec. Power Co., Inc. v. Westinghouse Elec. Corp.*, 418 F. Supp. 435, 459 (S.D.N.Y. 1976) ("In general, the precise demarcation between direct and consequential damages is a question of fact, and the commercial context in which a contract is made is of substantial importance in determining whether particular items of damages will fall into one category or the other.").

Applying these principles here, the Court concludes that the limitation of liability provision cannot require dismissal of all counts asserted in the Amended Complaint at this time.  As will be discussed in greater detail below, there is an open question of fact regarding whether Celsius established any "risk parameters and other criteria" as well as "policies, procedures and other safeguards" for ITB to comply with in providing the Services.  (Agreement § 1 ("[ITB]

26

will provide the Services subject to any and all risk parameters and other criteria established

from time to time by [Celsius]."); *id.*, App'x A § 3 ("[ITB] shall comply with all policies,

procedures and other safeguards [Celsius] establishes from time to time in connection with the

Services.").)  The Court cannot presently determine whether the investment in the Curve

Polygon liquidity pool and inclusion of a disassembling mechanism in the smart contract that

resulted in Celsius's incurrence of the exit fee violated "risk parameters" or "other safeguards,"

if any, that Celsius put into place.  In other words, even accepting all factual allegations in the

Amended Complaint as true and drawing all reasonable inferences in the Plaintiff's favor, it is

unclear whether such parameters or safeguards existed and, if so, whether they were not

complied with and the Agreement breached.

Indeed, determination of whether the 90 WBTC the Litigation Administrator seeks

constitutes "direct" or "indirect" damages will likely hinge on whether there was a violation,

which neither party has adequately addressed.  (*See, e.g.*, Amended Complaint ¶ 44 (alleging

only that Celsius did not know about the disassembling mechanism and stating that Celsius

would not have agreed to invest if it had known); Opposition at 16 (asserting solely that ITB

breached its duties to Celsius by investing in the Curve Polygon liquidity pool "without

understanding the [associated] risk[s]"); Motion at 6 (suggesting merely Celsius's consent to the

disassembly mechanism, stating that ITB was not permitted to do anything not already

predetermined in the smart contract without Celsius's direction and approval and that Celsius

otherwise had "full visibility"); *id.* at 17 (alleging that Celsius admittedly knew about the

disassembling mechanism and, without support, both "researched and agreed to deploy [the]

Strategy").)  As discussed in greater detail below, the Amended Complaint does allege that ITB

failed to put into place the "appropriate" risk parameters, suggesting that such parameters may

27

have existed.  (Amended Complaint ¶ 66.)  To the extent ITB indeed failed to comply, it is

entirely plausible that the loss Celsius suffered was a "direct and natural consequence" of ITB's

actions that could entitle Celsius to direct damages.  However, without the ability to definitively

conclude one way or the other based on the record before it, the Court declines to dismiss the

Amended Complaint on such grounds.

Accordingly, the Court concludes that the limitation of liability provision set forth in the

Agreement does not, at this time, require dismissal of the Amended Complaint in its entirety.[10]

### B.  Count II Survives Dismissal

Count II of the Amended Complaint asserts a claim for breach of the Agreement for

ITB's failure to "institute appropriate risk parameters for Celsius'[s] assets that ITB invested and

managed" in the Curve Polygon liquidity pool.  (*See* Amended Complaint ¶ 66.)  Moreover, the

Litigation Administrator seeks damages on account of such alleged breach in an amount no less

than the "value of the approximately 90 WBTC that Celsius lost."  (*Id.* ¶¶ 67–68.)  As support,

the Litigation Administrator points to section 10 of the Agreement, an indemnification clause,

that it believes serves as acknowledgment that ITB possessed "duties" under the Agreement.  (*Id.*

(noting the carve out for bad faith, gross negligence or willful misconduct in the parties'

performance of their "duties under [the] Agreement").)  Specifically, section 10 of the

Agreement provides:

> Each Party agrees to indemnify and hold harmless the other Party, its
> affiliates, and its respective officers, directors, agents and employees from
> any and all claims, demands, losses, causes of action, damage, lawsuits,
> judgments . . . arising out of, or relating to, ***any fraud*** committed by the
> breaching Party, except for any and all claims, demands, losses, expenses
> and liabilities arising out of or relating to that Party's bad faith, gross

---

[10]     The Court, therefore, need not reach the Litigation Administrator's argument that the limitation of liability
provision should be read in conjunction with the indemnification provision of the Agreement or that ITB's reading
"lacks commercial sense."  (*See* Opposition at 8–10.)

negligence or willful misconduct in the performance of its duties under this
Agreement.

(Agreement § 10 (emphasis added).)

Under English law, "[a] breach of contract may be committed . . . by the failure to

perform some obligation under the contract at the time it ought to be fulfilled."[11] *Intern. Min. &*

*Res. S.A. v. American Gen. Res. Inc.*, No. 87 CIV. 3988 HB, 1999 WL 672907, at *3 (S.D.N.Y.

Aug. 27, 1999) (quoting *Thorpe v. Fasey* [1949] 2 All ER 393); *see Chike-C Onyeari v. Churchil*

*Ltd.* [2024] EWHC (KB) 531 [128] (Eng. & Wales) (looking to the "express contractual

obligations" as the starting point for a breach of contract analysis).  Moreover, as discussed, such

a breach can give rise to both "direct" and "indirect" damages.  *See supra* pp. 25–26; *Chike-C*

*Onyeari* [2024] EWHC (KB) 531 [136] (turning to the question of appropriate damages after

determining that a breach of contract took place).  The law in New York is similar.  To establish

a claim for breach of contract under New York law, a party must provide "proof of (1) an

agreement, (2) adequate performance by the plaintiff, (3) breach by the defendant, and (4)

damages."  *Fischer & Mandell, LLP v. Citibank, N.A.*, 632 F.3d 793, 799 (2d Cir. 2011)

(citations omitted).

Here, the Amended Complaint has sufficiently pled a claim for breach of contract.  As

already discussed, the Agreement requires ITB to provide the Services in compliance with and

subject to any "risk parameters and other criteria" and "policies, procedures and other

---

[11]     Only the Litigation Administrator has offered any view on what the governing English standard is for a
breach of contract claim.  Specifically, it believes that the elements of a breach of contract claim under English law
are "extremely similar" to those under Delaware law.  (Motion at 16 (citing *Greensill Cap. (UK) Ltd. v. Tempus*
*Intermediate Holdings, LLC*, No. 4:17-cv-127, 2018 WL 4441207 (E.D. Va. Sept. 17, 2018)).)  Under Delaware
law, a plaintiff must demonstrate (i) the existence of a contract; (ii) the breach of an obligation imposed by that
contract; and (iii) damages to the plaintiff as a result of the breach.  (*Id.* (citing *Keller Founds., LLC v. Zurich Am.*
*Ins. Co.*, 758 F. App'x 22, 25 (2d Cir. 2018), a summary order with no precedential effect).)  ITB does not state one
way or another whether it agrees with the standard the Litigation Administrator has offered.  The Court, nonetheless,
performs its own analysis.

safeguards" Celsius may have established.  (Agreement § 1; *id.*, App'x A § 3.)  The Amended

Complaint pleads that (i) the Agreement "constituted a binding agreement between Celsius and

ITB"; (ii) Celsius performed its obligations under the Agreement; (iii) ITB "breached the

Agreement by failing to institute ***appropriate*** risk parameters for Celsius'[s] assets that ITB

invested and managed"; and (iv) "Celsius incurred damages" as a result of ITB's breach.

(Amended Complaint ¶¶ 64–66, 68 (emphasis added).)  As noted, the Litigation Administrator

also alleges that Celsius had no knowledge of the disassembly mechanism.  (*Id.* ¶ 44.)

While an open factual question exists as to what these risk parameters, if any, actually

were, the Amended Complaint nonetheless pleads that ITB failed to put into place the

"appropriate" risk parameters, suggesting that they may have existed and were not complied

with.  *See In re Lehman Bros. Holdings Inc.*, 553 B.R. 476, 491 (Bankr. S.D.N.Y. 2016), *aff'd*,

No. 17 CIV. 1224 (LGS), 2018 WL 1322225 (S.D.N.Y. Mar. 14, 2018), *aff'd*, 970 F.3d 91 (2d

Cir. 2020) ("[T]he appropriate inquiry 'is not whether a plaintiff is likely to prevail, but whether

[he] is entitled to offer evidence to support [his] claims.'" (alterations in original) (quoting

*Chance v. Armstrong*, 143 F.3d 698, 701 (2d Cir. 1998))).  This is sufficient to give rise to the

possibility of a right to relief beyond mere speculation.  *See Twombly*, 550 U.S. at 555–56

("Factual allegations must be enough to raise a right to relief above the speculative level . . . on

the assumption that all the allegations in the complaint are true (even if doubtful in fact) . . . ."

(citations omitted)); *see also id.* at 556 ("In applying these general standards to a § 1 [Sherman

Act] claim, we hold that stating such a claim requires a complaint with enough factual matter

(taken as true) to ***suggest*** that an agreement was made." (emphasis added)).

Accordingly, the Motion as to Count II is **DENIED**.[12]

### C. ITB Was Not Dealing in Securities and Was, Therefore, Not an Investment Adviser

Central to Counts I, III, and IV of the Amended Complaint is the Litigation Administrator's allegation that ITB acted as an investment adviser to Celsius within the meaning of the IAA.  Each cause of action states that ITB, as an investment adviser, owed Celsius certain fiduciary duties that ITB breached, giving rise to claims for breach of fiduciary duty (Count I) and simple and gross negligence (Counts III and IV).  (*See* Amended Complaint ¶¶ 55–62 (alleging as Count I that ITB, operating as an investment adviser, breached its fiduciary duties when it invested Celsius's assets subject to a smart contract with a disassembly mechanism in the Curve Polygon liquidity pool and failed to disclose the risks and report the loss); *id.* ¶¶ 70–74 (alleging as Count III that, "[a]s an investment adviser and asset manager to Celsius, ITB owed Celsius a duty to act with care and loyalty," which ITB breached with grossly negligent conduct); *id.* ¶¶ 76–78 (alleging as Count IV that ITB, an investment adviser, owed Celsius a duty to "act with care and loyalty" that it breached "by acting negligently").

The IAA defines an "investment adviser" to be:

> [A]ny person who, for compensation, engages in the business of advising others . . . as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities.

15 U.S.C. § 80b-2(a)(11).[13]  Therefore, fundamental to being an investment adviser under the IAA is the requirement that a person be dealing in "securities."  The necessary corollary then is

---

[12]     In light of the Court's ruling, it need not address the Litigation Administrator's assertion that English law recognizes an implied duty of good faith and fair dealing in commercial contracts, which may be raised at trial.  (*See* Opposition at 17.)

[13]     The definition is subject to seven exemptions for certain individuals as well as an exemption for "such other persons not within the intent of this paragraph, as the [Securities and Exchange] Commission may designate

that one cannot be considered an investment adviser unless one is engaged in the business of

securities.

Under the IAA, a "security" is broadly defined to be:

> [A]ny note, stock, treasury stock, security future, bond, debenture, evidence
> of indebtedness, certificate of interest or participation in any profit-sharing
> agreement, collateral-trust certificate, preorganization certificate or
> subscription, transferable share, investment contract, voting-trust
> certificate, certificate of deposit for a security, fractional undivided interest
> in oil, gas, or other mineral rights, any put, call, straddle, option, or privilege
> on any security . . . or on any group or index of securities . . . , or any put,
> call, straddle, option, or privilege entered into on a national securities
> exchange relating to foreign currency, or, in general, any interest or
> instrument commonly known as a "security", or any certificate of interest
> or participation in, temporary or interim certificate for, receipt for, guaranty
> of, or warrant or right to subscribe to or purchase any of the foregoing.

15 U.S.C. § 80b-2(a)(18). The definition sets forth an exclusive list of what may constitute a

"security" under the IAA. Thus, whether something qualifies as a "security" necessarily requires

an inquiry into whether it may be considered one of the items enumerated in the definition.

Here, the Amended Complaint alleges that ITB "engaged in crypto transactions on behalf

of Celsius which constitute investment contracts and therefore fall within the definition of

'security.'" (Amended Complaint ¶ 25.) In support, the Litigation Administrator plainly asserts

that digital assets are securities. (Opposition at 11.) The Litigation Administrator is correct in

recognizing that the IAA's definition of "security" does not explicitly include digital assets

themselves, contending instead that the "crypto transactions" ITB engaged in on behalf of

Celsius constitute "investment contracts." (Amended Complaint ¶ 25; *see also* Opposition at 11

(arguing that the definition of "securities" is broad and includes "investment contracts").)

---

by rules and regulations or orders." 15 U.S.C. § 80b-2(a)(11). No party has argued that any of the exemptions
apply.

The seminal case regarding what constitutes an "investment contract" and therefore, a "security" for purposes of securities laws is the Supreme Court's decision in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946). In *Howey*, the Supreme Court held that, under the Securities Act of 1933 (the "Securities Act"), an "investment contract" means "a contract, transaction or scheme whereby a person [(i)] invests his money in a [(ii)] common enterprise and [(iii)] is led to expect profits solely from the efforts of the promoter or a third party." *Howey*, 328 U.S. 298–99. While the *Howey* case did not concern the definition of security under the IAA, focusing solely on the Securities Act, the case is nonetheless instructive as the definition of "security" under the IAA is "virtually identical" to the definition under the Securities Act.[14] *Compare* 15 U.S.C. § 80b-2(a)(18) (IAA definition) *with* 15 U.S.C. § 77b(a)(1) (Securities Act definition). *See also Chadbourne & Parke LLP v. Troice*, 571 U.S. 377, 382 (2014) (noting in a parenthetical that the definitions of "security" under the Securities Act and the IAA are "virtually identical" to the definition of "security" under the Securities Exchange Act of 1934 (the "Securities Exchange Act")). Indeed, the only notable difference between the two is that the Securities Act's definition includes "security-based swap," which the IAA's does not contain; the definitions are otherwise effectively the same. Moreover, between the Securities Act and the Securities Exchange Act—

---

[14]    The Securities Act defines "security" to be:

> The term "security" means any note, stock, treasury stock, security future, security-based swap, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities . . . , or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or, in general, any interest or instrument commonly known as a "security", or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

15 U.S.C. § 77b(a)(1).

where the "precise wording of the two definitional sections differs" as to what constitutes a

security—"the Supreme Court has consistently held that the definitions are virtually identical and

the coverage of the two Acts may be considered the same." *Gary Plastic Packaging Corp. v.*

*Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 756 F.2d 230, 238 (2d Cir. 1985) (citations

omitted).

While the parties do not address the foregoing, both the Litigation Administrator and ITB

cite *Howey* as being the relevant standard for the Court to use in determining whether an

"investment contract" exists.  (*See, e.g.*, Motion at 11 (articulating, without reference to the IAA,

the *Howey* standard for an "investment contract"); Opposition at 11 (stating only that securities

laws define "security" broadly to include "investment contracts" as defined in *Howey*).)

Accordingly, the Court adopts the *Howey* test in determining whether an "investment contract"

and, therefore, a "security" exists for purposes of the IAA.  *See Pollack v. Laidlaw Holdings,*

*Inc.*, 27 F.3d 808, 815 (2d Cir. 1994) (concluding that the IAA was "intended to ***complement***,

rather than substitute for, the 1933 and 1934 Acts" (emphasis added)).

Applying *Howey*, the Court concludes that the Amended Complaint fails to adequately

plead that ITB was dealing in securities.  Contrary to the Litigation Administrator's assertion that

"digital assets are securities," courts applying *Howey* have concluded that digital tokens in and of

themselves do not constitute an "investment contract."  *See, e.g.*, *SEC v. Ripple Labs, Inc.*, 682 F.

Supp. 3d 308, 324 (S.D.N.Y. 2023) ("XRP, as a digital token, is not in and of itself a 'contract,

transaction[,] or scheme' that embodies the Howey requirements of an investment contract."

(alterations in original)).  Instead, courts will look to the "***totality of circumstances*** surrounding

[d]efendants' different transactions and schemes" in determining whether an "investment

contract" exists.  *Id.* (emphasis added); *see, e.g.*, *SEC v. Telegram Grp. Inc.*, 448 F. Supp. 3d

352, 379 (S.D.N.Y. 2020) (holding that the security in the case was not simply the digital token, which was "little more than alphanumeric cryptographic sequence," but rather the relevant inquiry was whether "the full set of contracts, expectations, and understandings centered on the sales and distribution of the [digital token]" constituted a "scheme" for purposes of *Howey*); *SEC v. Terraform Labs Pte. Ltd.*, 708 F. Supp. 3d 450, 472–73 (S.D.N.Y. 2023) (holding that the digital token in combination with the applicable protocol, as opposed to the digital token itself, constituted a security); *United States v. Mashinsky*, No. 23-CR-347 (JGK), 2024 WL 4728500, at *4 (S.D.N.Y. Nov. 8, 2024) (stating that the rulings in *Terraform*, *Ripple Labs*, and *Telegram* "rejected the defendants' attempts to avoid liability under the federal securities laws by focusing only on discrete parts of an alleged scheme, rather than on the scheme as a whole"). Therefore, in performing the analysis, "form should be disregarded for substance and the emphasis should be on economic reality." *SEC v. Kik Interactive Inc.*, 492 F. Supp. 3d 169, 177 (S.D.N.Y. 2020) (quoting *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967)). (*See also* Opposition at 11 (acknowledging that "[m]any courts have found the existence of 'investment contracts' with respect to schemes involving the offer and sale of 'digital assets'").)

In each of *Ripple Labs*, *Telegram*, and *Terraform*, courts evaluated whether digital assets constituted securities pursuant to the definition of "security" set forth in the Securities Act. However, as already discussed, the definition of "security" under the Securities Act is "virtually identical" to the IAA's and does not include "digital assets" or "digital tokens." Therefore, similar reasoning applies here, and, in any event, the Amended Complaint does not itself plead that digital assets themselves can constitute a "security."

Turning then to the "crypto transactions" that the Litigation Administrator claims comprise an "investment contract," the only transaction the Amended Complaint actually pleads

is ITB's investment and management of Celsius's 120 amWBTC in the Curve Polygon liquidity

pool on Celsius's behalf, 90 of which was lost when the smart contract's disassembly mechanism

was triggered.  (Amended Complaint ¶¶ 41, 43.)  While the Amended Complaint indicates that

"Celsius deposited millions of dollars of cryptocurrency with ITB, including [BTC], [WBTC],

[ETH], [LINK], [DAI], and [USDC]" that ITB invested in "various DeFi strategies," the

Amended Complaint only sheds light on the Curve Polygon liquidity pool investment involving

Celsius's WBTC, which serves as the sole transaction underlying the relief sought.  (*Id.* ¶ 29; *see

also id.* ¶ 48 (stating that, on January 26, "Sabo informed ITB that Celsius would withdraw ***all

funds*** it had placed with ITB until it fully understood what had happened" (emphasis added)); *id.*

¶¶ 85–86 (indicating that ITB "returned only approximately 30 of the 120 WBTC that Celsius

had deposited with ITB" and that ITB's "liability for approximately 90 WBTC remained

outstanding at the time Celsius filed its Chapter 11 petition . . . and remained outstanding during

the pendency of Celsius'[s] Chapter 11 cases").)

Evaluating this individual transaction, the Court concludes that the Litigation

Administrator has failed to plead sufficient facts to establish a plausible claim that the *Howey*

test has been satisfied.  *See Donovan v. GMO-Z.com Tr. Co., Inc.*, No. 23 CIV. 8431 (AT), 2025

WL 522503, at *7 (S.D.N.Y. Feb. 17, 2025) ("The test for an investment contract requires

[p]laintiffs to identify a transaction, contract, or scheme pursuant to which a thing of value was

offered or sold.").  Assuming *arguendo*, as an initial matter, that Celsius's deposit of its 120

WBTC with ITB constituted an "investment of money" in satisfaction of the first *Howey* prong,

there is no allegation in the Amended Complaint whatsoever of a common enterprise.  "A

plaintiff may demonstrate a common enterprise by pleading the existence of 'horizontal

commonality.'"  *Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340, 353 (S.D.N.Y. 2019) (quoting

*Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994)). To establish horizontal commonality, "'the fortunes of each investor in a pool of investors' are tied to one another and to the 'success of the overall venture.'" *Id.* (quoting *Revak*, 18 F.3d at 87). In other words, there must be a "sharing or pooling of funds." *Id.* (quoting *In re J.P. Jeanneret Assocs., Inc.*, 769 F. Supp. 2d 340, 359 (S.D.N.Y. 2011)). Here, there is no allegation that a common enterprise existed and, to the extent the Curve Polygon liquidity pool could potentially have been one, the Amended Complaint does not allege that the financial success of participants in the pool was dependent on the success of others.

In addition, the Amended Complaint also fails to allege sufficient facts that make plausible that Celsius was "led to expect profits solely from the efforts of the promoter or a third party." *Howey*, 328 U.S. at 299. In other words, the inquiry is whether Celsius's expectation of profits depended on the "essential efforts" of ITB. *See Telegram*, 448 F. Supp. 3d at 368. Nowhere does the Amended Complaint allege this is the case, stating instead that the parties intended that ITB and Celsius would "***collaborate*** on the research and design of DeFi quant strategies." (Amended Complaint ¶ 14 (emphasis added).) In fact, the Agreement itself provides that ITB shall engage in "any additional trading strategy ***mutually agreed to*** by the Parties." (Agreement § 1 (emphasis added).) Moreover, as already discussed, ITB's provision of the Services generally was subject to "all policies, procedures, and other safeguards [Celsius] establishes from time to time," and ITB was prohibited from, among other things, "withdraw[ing] any Strategy Assets or fiat currency from any cold wallet or exchange without [Celsius's] prior written approval." (*Id.*, App'x A § 3.) In other words, the Amended Complaint contains no allegations that ITB conveyed to Celsius that its anticipated profits from its investment would solely be the result of ITB's efforts. *See, e.g.*, *ATBCOIN*, 380 F. Supp. 3d at

355 (finding that the third *Howey* prong was satisfied where "Defendants conveyed to purchasers of ATB Coins that the anticipated return on their investment would be the result of Defendants' efforts to commercialize the ATB Blockchain and ATB Coins").

The same holds true to the extent it is the Agreement itself that the Litigation Administrator believes constitutes the "investment contract." The Amended Complaint does not plead any facts that the Services, which includes the engagement of "trading strategies in the [DeFi] markets . . . as well as any additional trading strategy mutually agreed to by the Parties," has features of horizontal commonality. (Agreement § 1.) Nor does the Amended Complaint allege that Celsius expected profits were to be solely derived from the efforts of ITB or another third party. (*See also* Opposition at 11–12 (acknowledging that courts have found the existence of "investment contracts" with respect to "schemes involving the offer and sale of 'digital assets'" pursuant to *Howey* but failing to perform any *Howey* analysis in support).)

Accordingly, the Court concludes that the Litigation Administrator has failed to plead facts sufficient to support a finding that there was an investment contract and therefore, a security. Considering such, the Litigation Administrator has failed to establish that ITB was an investment adviser under the IAA.[15] While the Litigation Administrator makes much ado about how the services ITB provided to Celsius under the Agreement "are the hallmarks of investment advisers," ITB cannot be an investment adviser if it is not, in the first instance, dealing in securities. (Amended Complaint ¶ 26; *see* Opposition at 12–13 (listing "activities" ITB was

---

[15]    The Court also need not reach ITB's assertion that ITB was not dealing in securities because the transaction that serves as the focus of the Amended Complaint concerned solely WBTC, which is pegged to BTC, a digital token that the SEC has maintained is not a security. While it may be the SEC's policy that BTC is not a security for purposes of enforcing federal securities laws, it does not appear to have been a matter courts have addressed. *See, e.g.*, *ATBCOIN*, 380 F. Supp. 3d at 357 n.15 (noting that none of the defendants' cited decisions "addresses the proper characterization of Bitcoin under the federal securities laws" and, without concluding one way or the other, indicating that "important distinctions" between BTC and the digital token in question exist).

engaged in that are "emblematic of what an investment adviser does").)  With this, the Court

now turns to each of Counts I, III, and IV.

      1.  <u>Count I Is Dismissed</u>

As set forth in the Amended Complaint, Count I asserts that ITB breached fiduciary

duties owed to Celsius that stem from its alleged role as an investment adviser to Celsius.  (*See*

Amended Complaint ¶ 58 ("As an investment adviser and asset manager to Celsius, ITB owed

fiduciary duties to Celsius, including a duty to act with care and loyalty in investing and

managing Celsius'[s] assets."); *see also* Opposition at 14 (asserting that ITB was wrong to argue

that it owed no fiduciary duty to Celsius because "[i]nvestment advisers owe fiduciary duties of

care and loyalty to their clients").)  It is on account of ITB's alleged breach of these duties,

Count I maintains, that the Litigation Administrator believes Celsius was harmed in an amount

no less than the value of approximately 90 WBTC.  (Amended Complaint ¶ 62.)  Given the

Court's conclusion, however, that the Amended Complaint fails to plead sufficient facts to

establish that ITB was an investment adviser to Celsius as defined under the IAA, Count I must

be dismissed.

The Court notes further that the Agreement also makes clear that ITB is an "independent

contractor of [Celsius]," and "[n]othing contained in [the] Agreement shall be construed to create

the relationship of employer and employee, principal and agent, partnership or joint venture, or

***any other fiduciary relationship***."  (Agreement § 5 (emphasis added).)  The Litigation

Administrator argues that reliance on this provision "must fail" since "ITB solicited [Celsius]" to

allow ITB "to act as its investment adviser and asset manager."  (Opposition at 14–15.)

However, the Agreement contains a merger clause that provides that the Agreement "and any

accompanying appendices, duplicates, or copies, constitutes the entire agreement between the

Parties with respect to the subject matter of [the] Agreement, and ***supersedes*** all prior

negotiations, agreements, representations, and understandings of *any kind*, whether written or oral, between the Parties, *preceding the date of this Agreement*."  (Agreement § 11(c) (emphasis added).)

Neither the Litigation Administrator nor ITB has addressed how such clauses are dealt with under English law.  Therefore, turning to New York law, "an integration, or merger, clause, where effective, can 'require full application of the parol evidence rule in order to bar the introduction of extrinsic evidence to vary or contradict the terms of the writing.'"  *Volt Elec. NYC Corp. v. A.M.E., Inc.*, 586 F. Supp. 3d 262, 281 (S.D.N.Y. 2022) (quoting *OneBeacon Am. Ins. Co. v. Comsec Ventures Int'l, Inc.*, No. 07 Civ. 900 (GLS), 2010 WL 114819, at *4 (N.D.N.Y. Jan. 7, 2010)); *see also Manufacturers Hanover Tr. Co. v. Yanakas*, 7 F.3d 310, 315 (2d Cir. 1993) ("[I]f a contract recites that all of the parties' agreements are merged in the written document, parol evidence is not admissible to vary, or permit escape from, the terms of the integrated contract.").  Moreover, "[w]hether an integration or merger clause in a contract suffices to defeat a party's reliance on representations made during the process leading up to the contract depends on the specificity of the clause disclaiming those representations."  *Volt Elec.*, 586 F. Supp. 3d at 281 (quoting *Tradeshift, Inc. v. Smucker Servs. Co.*, No. 20 Civ. 3661 (MKV), 2021 WL 4463109, at *7 (S.D.N.Y. Sept. 29, 2021)).

Here, the merger clause is both specific and clear in barring consideration of extrinsic evidence that predates the Agreement.  *See also Ocwen Loan Serv., LLC v. Rescap Liq. Trust (In re Residential Cap., LLC)*, 533 B.R. 379, 397–98 (Bankr. S.D.N.Y. 2015) (noting that "New York law 'gives full effect to merger clauses'" and may extinguish even "a previous agreement if the merger clause expressly states that the new (or later dated) agreement supersedes" (quoting *Roberts v. Edith Roman Holdings*, No. 10 Civ. 4457 (LAP), 2011 WL 2078223, at *3 (S.D.N.Y.

May 19, 2011))).  Therefore, the language of the Agreement concerning the nature of the

relationship between Celsius and ITB governs.

Accordingly, the Motion is **GRANTED** as to Count I.

      2.  <u>Counts III and IV Are Dismissed</u>

Similarly, Counts III and IV, which assert claims for gross negligence and negligence,

respectively, also predicate ITB's liability on alleged fiduciary duties ITB owed to Celsius as a

purported "investment adviser and asset manager" to Celsius.  (Amended Complaint ¶ 70 (Count

III); *id.* ¶ 76 (Count IV).)  Specifically, both Count III and Count IV contend that ITB breached a

"duty to act with care and loyalty in investing and managing Celsius'[s] assets" when it invested

in the Curve Polygon liquidity pool subject to a smart contract containing a disassembly

mechanism.  (*Id.* ¶¶ 71, 77.)  Such conduct, the Amended Complaint argues was both negligent

and grossly negligent.  (*Id.* ¶¶ 73, 77.)

Both the Litigation Administrator and ITB agree that, under English law, claims for

simple and gross negligence require, as a baseline, a breach of a duty of care.[16]  (*See* Reply at 9

("[A]s [with] any negligence law in the United States, English law requires there to be a duty

owed by defendant to plaintiff before a defendant can be found negligent in any way." (citing

*Armstead v. Royal & Sun All. Ins. Co. Ltd.* [2024] UKSC 6 [20])); Opposition at 18 (suggesting

that, under English law, the "distinction between negligence and gross negligence appears to lie

in the degree of departure from the standard of reasonable care").)  *See also In re Lehman Bros.*

*Holdings Inc.*, 602 B.R. 564, 589–90 (Bankr. S.D.N.Y. 2019) ("Under English law, 'gross

negligence' in the contractual commercial context is more than a fundamental failure to exercise

---

[16]    While ITB acknowledges that English law governs the Agreement, it indicates that it "does not concede
that English law applies to the two negligence claims."  (Reply at 8 ("[T]he Agreement is governed by English
law"); *id.* at 9 n.4 (stating that it addresses English law as to the two negligence claims despite not conceding that
such law applies).)

proper skill or care; gross negligence arises from conduct 'undertaken with actual appreciation of the risk involved [and] also serious disregard of or indifference to an obvious risk.'" (alteration in original)).

Here, the Amended Complaint pleads only that ITB breached the duty it owed to Celsius to "act with care and loyalty" solely in connection with ITB's alleged role as an investment adviser to Celsius.  As discussed, however, the Litigation Administrator failed to adequately plead that ITB was an investment adviser under the IAA, and the Agreement itself explicitly provides that there is no fiduciary relationship between Celsius and ITB.  (*See* Agreement § 5.) Moreover, with respect to the claim for gross negligence in particular, the Court also notes that the Amended Complaint does not allege sufficient facts that would suggest that ITB recklessly disregarded its obligations when it invested Celsius's assets.  Therefore, Counts III and IV must also be dismissed.[17]

Accordingly, the Motion is **GRANTED** as to Counts III and IV.

### D.  Finally, Count V is Dismissed For Lack of "Matured" Debt and Celsius's Opposition

Count V of the Amended Complaint asserts a claim for turnover of 90 WBTC and "all proceeds, rents or profits thereof, or recovery of an equivalent judgment for the value of the property of the estate" pursuant to section 542(b) of the Bankruptcy Code.  (Amended Complaint ¶ 90.)  Section 542(b) provides:

> [A]n entity that owes a debt that is property of the estate and that is *matured, payable on demand, or payable on order*, shall pay such debt to, or on the order of, the trustee, except to the extent that such debt may be offset under section 553 of this title against a claim against the debtor.

---

[17]    The Court, therefore, need not reach the parties' arguments regarding whether the economic loss doctrine bars the Litigation Administrator's negligence and gross negligence claims or the Litigation Administrator's proposed framework to evaluate claims for gross negligence.

11 U.S.C. § 542(b) (emphasis added).

Generally, a debt is considered "matured or payable on demand" if it is one that is "presently payable, as opposed to [one] that [is] contingent and become[s] payable only upon the occurrence of a certain act or event.'" *Securities Investor Prot. Corp. v. Rossi (In re Cambridge Cap., LLC)*, 331 B.R. 47, 57 (Bankr. E.D.N.Y. 2005) (alterations in original) (citation and internal quotation marks omitted); 5 COLLIER ON BANKRUPTCY ¶ 542.04 (16th ed. 2023) (stating the same).  The focus of a court's analysis, then, is whether a debt is "matured."

A debt is considered "matured" if it is "specific in its terms as to amount due and date payable." *Tese-Milner v. TPAC, LLC (In re Ticketplanet.com)*, 313 B.R. 46, 67 (Bankr. S.D.N.Y. 2004) (citing *Shea & Gould v. Red Apple Cos. (In re Shea & Gould)*, 198 B.R. 861, 867 (Bankr. S.D.N.Y. 1996)); *see also Kenston Mgmt. Co. v. Lisa Realty Co. (In re Kenston Mgmt. Co.)*, 137 B.R. 100, 107–08 (Bankr. E.D.N.Y. 1992) ("[F]or an action to be a turnover proceeding, it is not relevant that [all] the defendant[s] dispute the existence of the debt by, perhaps, denying the complaint's allegations, as long as these allegations state the existence of a mature debt." (alterations in original) (citation and internal quotation marks omitted)).

Here, relief for Count V necessitates, as a threshold matter, a determination of whether ITB breached the Agreement (*i.e.*, resolution of Count II), which would give rise to a "matured" debt thereunder.  (*See* Amended Complaint ¶ 88 (pleading that Celsius has not received a payment from ITB for "damages it caused Celsius").)  "It is settled law that the debtor cannot use the turnover provisions to liquidate contract disputes or otherwise demand assets whose title is in dispute." *Hirsch v. London S.S. Owners' Mut. Life Ins. Ass'n Ltd. (In re Seatrain Lines, Inc.)*, 198 B.R. 45, 50 n.7 (S.D.N.Y. 1996) (quoting *U.S. v. Inslaw, Inc.*, 932 F.2d 1467, 1472 (D.C.

Cir. 1991)).  As the question of whether the Agreement was breached remains open, the debt is

not "matured," and Count V cannot survive dismissal.

In addition, Count V must also be dismissed for the Litigation Administrator's failure to

address ITB's arguments and requested dismissal in its opposition.  "Numerous courts in this

District have held that a party's failure to address an issue in its response to a Rule 12(b)(6)

motion 'amounts to a concession or waiver of the argument.'"  *Piuggi v. Good for You Prods.*

*LLC*, 739 F. Supp. 3d 143, 168 (S.D.N.Y. 2024) (quoting *Francisco v. Abengoa, S.A.*, 559 F.

Supp. 3d 286, 318 n.10 (S.D.N.Y. 2021)); *see also Cole v. Blackwell Fuller Music Publ'g, LLC*,

No. 16-CV-7014 (VSB), 2018 WL 4680989, at *7 (S.D.N.Y. Sept. 28, 2018) (same).  Here, the

Opposition makes no mention of Count V and does not address any arguments ITB has set forth

in support.

Accordingly, the Motion is **GRANTED** as to Count V.

### IV.    <u>CONCLUSION</u>

For the reasons discussed, the Motion is **GRANTED** in part and Counts I, III, IV, and V

are hereby **DISMISSED** with prejudice.

**IT IS SO ORDERED.**

Dated:    March 10, 2025
          New York, New York

*Martin Glenn*
_____
MARTIN GLENN
Chief United States Bankruptcy Judge